[No. G005171. Fourth Dist., Div. Three. Jan. 29, 1988.]

HOMER ORDWAY, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
JUDY CASELLA et al., Real Parties in Interest.

**COUNSEL**

Sheehan & Booser and Michael C. Booser for Petitioner.

No appearance for Respondent.

Munns, Kofford, Hoffman, Hunt & Throckmorton and Edward H. Cummings for Real Parties in Interest.

**OPINION**

**CROSBY, J.**—Does reasonable implied assumption of risk remain a viable defense after the adoption of comparative fault? We hold it does.

**I**

Judy Casella, a veteran jockey who had ridden in 500 professional horse races without incident, was thrown from her mount and further injured when the equine fell and rolled over her during a quarterhorse race at Los Alamitos Race Course on January 3, 1983. The tragic chain of events began when Over Shadow, owned by petitioner Homer Ordway, tangled with another steed, Speedy Ball, who then stumbled in front of Casella's horse. The California Horse Racing Board determined the jockey riding Over Shadow violated a board rule by "crossing over without sufficient clearance, causing interference," and he was suspended for five racing days. Alleging "negligence, carelessness and unlawful conduct," Casella sued the riders, trainers, and owners of Over Shadow and Speedy Ball.

Ordway moved for summary judgment. The motion was denied, and Ordway sought extraordinary relief in this court. We denied the writ application, and he petitioned the Supreme Court. That court granted review and, citing *Turcotte* v. *Fell* (1986) 68 N.Y.2d 432 [510 N.Y.S.2d 49, 502 N.E.2d. 964], a decision by New York's highest court, transferred the matter to us with directions to issue an alternative writ. ██ We did so and now follow with a peremptory writ of mandate.[1]

---

[1] We denied hearing originally for these reasons: Prerogative writs should issue where irreparable injury is threatened, but rarely otherwise. A trial does not generally meet the definition of "irreparable injury," being at most an irreparable inconvenience. Also, it is not fair to parties on appeal who have often waited years for the final resolution of their disputes to have litigants in the pretrial stage elbow their way into the line at our door.

Appellate courts should not encourage the use of extraordinary writs as a method of reviewing rulings made in the law and motion department of the trial court. (*Continental Life*

## II

The initial question presented in this petition is whether the doctrine of reasonable implied assumption of risk survives in the era of comparative fault. We had occasion to touch on the subject once before (*Rudnick* v. *Golden West Broadcasters* (1984) 156 Cal.App.3d 793 [202 Cal.Rptr. 900]), but a resolution of the matter was not essential to that decision. It is now, however; and the answer is, "*Yes.*"

Courts and legal scholars have traditionally recognized three forms of assumption of risk. Express assumption of risk is exactly what the term describes: Where "the potential plaintiff agrees not to expect the potential defendant to act carefully, thus eliminating the potential defendant's duty of care, and acknowledging the possibility of negligent wrongdoing," the potential plaintiff has expressly assumed the risk of injury. (*Coates* v. *Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 7-8 [236 Cal.Rptr. 181].)

Reasonable implied assumption of risk is the inferred agreement to relieve a potential defendant of a duty of care based on the potential plaintiff's *reasonable* conduct in encountering a known danger. A second variety of implied assumption of risk is labeled unreasonable. (*Rudnick* v. *Golden West Broadcasters, supra,* 156 Cal.App.3d at pp. 798-799.) After a brief prefatory digression, we will explain the importance of the distinction between them in determining the rights of the parties.

The relationship between the concepts of implied assumption of risk and contributory negligence has been the source of some confusion. The two doctrines are quite separate in one sense, but overlap in another. More than thirty years ago, our Supreme Court explained the basic differences between them as follows: "The defenses of assumption of risk and contributory negligence are based on different theories. Contributory negligence arises from a [plaintiff's] lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care. [Citation.] It is available when there has been a voluntary acceptance of a risk and such acceptance, whether express or implied, has been made with knowledge and appreciation of the risk."

*Insurance Co.* v. *Superior Court* (1985) 165 Cal.App.3d 1069, 1072 [212 Cal.Rptr. 140].) Rather, there is wisdom in adhering to the policy of allowing appellate review by way of extraordinary relief only when other remedies have been fully exhausted. In this case, we presume the trial court's error in failing to grant Ordway's motion for summary judgment would have had little or no effect upon the outcome of trial: Ordway surely would have obtained a directed verdict or a defense verdict from an appropriately instructed jury. Appellate review might have been avoided entirely in that circumstance. If Casella did recover, however, we could have reversed on appeal, basing our opinion on a far more satisfactory record than the one presently before us.

(*Prescott* v. *Ralphs Grocery Co.* (1954) 42 Cal.2d 158, 161-162 [265 P.2d 904]; *Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 243-244 [53 Cal.Rptr. 545, 418 P.2d 153].)

■ In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the court "recognized [that the doctrine of assumption of risk] in fact is made up of at least two distinct defenses. 'To simplify greatly, it has been observed . . . that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . . Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care.' [Citations.]" (*Id.,* at p. 824.) The court determined that unreasonable assumption of risk should be merged with the theory of contributory negligence under comparative fault principles; i.e., while an injured party who unreasonably assumed a risk may recover, the damages will nonetheless be reduced by the percentage of fault attributed to him or her. (*Id.,* at p. 826.)

*Li* did not specifically determine whether a defense based on reasonable implied assumption of risk should survive the adoption of comparative fault, and the court has not had occasion to confront the issue since. Several other divisions of the Court of Appeal have, however.

In *Segoviano* v. *Housing Authority* (1983) 143 Cal.App.3d 162 [191 Cal.Rptr. 578], a player was injured during an amateur flag football game when an opponent, in violation of the rules, pushed him out of bounds. Ruling on an *in limine* motion, the trial court precluded the defendant, the institutional sponsor of the game, from relying on assumption of risk to defeat the plaintiff's claim. The plaintiff prevailed, but the jury discounted his award by 30 percent under comparative fault instructions.

Rejecting the notion "that a plaintiff who has reasonably assumed a risk may not recover damages because that form of assumption of risk negates defendant's duty of care to the plaintiff" (*id.,* at p. 168), *Segoviano* held only express assumption of risk remained a viable defense after *Li*. The appellate panel conceded *Li* explicitly merged only unreasonable assumption of risk into the concept of contributory negligence; but it concluded that where "the plaintiff's conduct [is] entirely reasonable under all of the circumstances, we find no basis in reason or equity for barring his recovery. Elimination of [reasonable implied assumption of risk] as a separate defense

avoids punishing reasonable conduct." (*Id.,* at p. 170.) Accordingly, the court not only reversed the judgment but also held the plaintiff's recovery could not be reduced under comparative fault principles because his implied assumption of the risk of injury in a flag football game was reasonable and, as a matter of law, provided no basis for apportionment of the damages.[2]

Having studied the problem anew, we remain unpersuaded by *Segoviano*'s holding. In our view, that opinion turned the law on its head. If plaintiff reasonably consented to participate in a touch football game, how could defendant's sponsorship of the contest be any less reasonable? Plaintiff and defendant had an equal opportunity to anticipate the over-exuberance of one of the participants and the potential for injury. There is no principled basis upon which any responsibility should be assigned to the defendant under those circumstances. The defendant merely provided plaintiff with the chance to play; *he* was the one who chose to risk an injury. There is also a strong policy basis for absolving the defendant in such circumstances: encouragement of persons and entities to provide opportunities to engage in sports and recreational activities without fear of suits by the participating beneficiaries.

The correct analysis is this: The doctrine of reasonable implied assumption of risk is only another way of stating that the defendant's duty of care has been reduced in proportion to the hazards attendant to the event. Where no duty of care is owed with respect to a particular mishap, there can be no breach; consequently, as a matter of law, a personal injury plaintiff who has voluntarily—and reasonably—assumed the risk cannot prevail. Or stated another way, the individual who knowingly and voluntarily assumes a risk, whether for recreational enjoyment, economic reward, or some similar purpose, is deemed to have agreed to reduce the defendant's duty of care.

The *Segoviano* court may have been misled because the distinction between the "reasonable" and "unreasonable" plaintiff is superficially anomalous: The former's civil action is barred while the latter's is allowed to go to judgment, reduced only in proportion to fault. But the explanation has nothing to do with rewarding or punishing a plaintiff, as *Segoviano* suggests.

---

[2] This court decided *Rudnick* v. *Golden West Broadcasters, supra,* 156 Cal.App.3d 793 the following year; and *Segoviano*'s analysis did not escape criticism: "While the concepts of 'express' versus 'implied' assumption of risk were well known in 1975 when *Li* was decided, the Supreme Court ignored them and focused only on the reasonableness of plaintiff's conduct. Moreover, *Segoviano*'s holding that implied consent, i.e., conduct by a plaintiff, cannot reduce or eliminate defendant's duty appears contrary to *Li*'s express acknowledgement that reasonable conduct involves precisely that." (*Id.,* at p. 800, fn. 4.)

Rather, it is found in the expectation of the defendant. He or she is permitted to ignore reasonably assumed risks and is not required to take extraordinary precautions with respect to them. The defendant must, however, anticipate that some risks will be unreasonably undertaken, and a failure to guard against those may result in liability.

For example, borrowing from an old legal saw, "[Because a] drunken man is as much entitled to a safe street, as a sober one, and much more in need of it" (*Robinson* v. *Pioche* (1855) 5 Cal. 460, 461), sidewalks should be constructed with safety in mind. If they are negligently built, inebriety will not bar a pedestrian's lawsuit for injury, although it may reduce his recovery.

Those who have taken a remunerative or recreational risk with a conscious awareness of all it entails, however, are on their own. A circus need not provide a net for an aerialist who does not want one. The owner of a dangerous piece of property, Niagara Falls for example, will have a complete defense to an action by a Hollywood stuntperson who, encased in a barrel, elects to enter the river above the falls. But the garden-variety inattentive member of the public who passes through a gate negligently left open, in the misguided belief that the water above the falls is safe for swimming, will only suffer a proportionate reduction in damages. A defendant must, under appropriate circumstances, anticipate the fool (which is merely another way of describing the careless and negligent). (*Bigbee* v. *Pac. Tel. & Tel. Co.* (1983) 34 Cal.3d 49 [192 Cal.Rptr. 857, 665 P.2d 947].)

The conduct of the stuntperson is "reasonable" in the eyes of the law, but not that of the negligent bather. Concededly, it does sound strange to decree that unreasonable plaintiffs may recover and reasonable ones may not; but the problem is not of law but semantics. If the "reasonable-unreasonable" labels were simply changed to "knowing and intelligent" versus "negligent or careless," the concepts would be more easily understood.

Our view is not unprecedented. In *Nelson* v. *Hall* (1985) 165 Cal.App.3d 709 [211 Cal.Rptr. 668], the Court of Appeal affirmed a summary judgment in favor of the owners of a dog who bit a veterinary assistant. The court had no trouble finding the risk of dog bites "endemic" to the occupation chosen by plaintiff and concluded, "This is a case of 'true' or 'primary' assumption of the risk whereby the defendant is *impliedly relieved of any duty of care* by the plaintiff's acceptance of employment involving a known risk or danger. [Citation.] A veterinary assistant cannot be deemed to have unreasonably

encountered a risk that is inherent in his or her job. Therefore, this type of assumption of the risk is not subsumed by comparative fault and, hence, is a complete defense. [Citations.]" (*Id.,* at p. 714, italics added.) We agree.

*Nelson* affords a good illustration of the difference between reasonable and unreasonable implied assumption of risk. A plaintiff bitten while foolishly attempting to pet a rabid dog negligently allowed to remain in a veterinarian's waiting room would be treated differently. The defendant would not enjoy an assumption of risk defense under such circumstances, although the plaintiff's recovery would be subject to reduction under comparative fault principles.

Another court reached the same conclusion in *Neinstein* v. *Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176 [229 Cal.Rptr. 612]: "In those situations in which a plaintiff acts unreasonably in taking a specific risk, the claim is merged into the system of assessing liability according to fault. [¶] On the other hand, where the plaintiff's conduct amounts to a release of the defendant's obligation of reasonable conduct, the assumption of risk doctrine continues to operate. As Dean Prosser explains '[W]here the plaintiff voluntarily enters into some relation with the defendant, with knowledge that the defendant will not protect him against one or more future risks that may arise from the relation . . . [h]e may then be regarded as tacitly or *impliedly* consenting to the negligence, and agreeing to take his own chances.' (Prosser & Keeton, Torts (5th ed. 1984) § 68, p. 481.)" (*Id.,* at p. 183.)

We are satisfied the *Nelson* and *Neinstein* analyses on the point are correct.[3] Support for them is found in *Walters* v. *Sloan* (1977) 20 Cal.3d 199 [142 Cal.Rptr. 152, 571 P.2d 609], the Supreme Court's post-*Li* and post-*Rowland*[4] reaffirmation of the fireman's rule: "[O]ne who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby. We have consistently applied this concept in our recent pronouncements in other cases of basic tort doctrine. [¶] The principle denying recovery to those voluntarily undertaking the hazard causing injury is fundamental in a number of doctrines, including nullification of the duty of care, satisfaction of the duty to warn because the hazard is known, contributory negligence, and assumption of risk, as well as in the fireman's rule. [Cita-

[3] Accordingly, we do not subscribe to the comment to BAJI No. 4.30 (7th ed. 1986) which fails to distinguish between reasonable and unreasonable implied assumption of risk and suggests that both forms have been abolished.

[4] *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].

tions.] It is unnecessary to attempt to separate the legal theories or to catalog their limitations. The rule finds its clearest application in situations like that before us—a person who, fully aware of the hazard created by the defendant's negligence, voluntarily confronts the risk for compensation." (*Id.,* at p. 204; see also *Baker* v. *Superior Court* (1982) 129 Cal.App.3d 710 [181 Cal.Rptr. 311].)

The notion that reasonable implied assumption of risk results in a nullification or reduction of the defendant's duty of care is also in line with the conclusion of the New York Court of Appeals in *Turcotte* v. *Fell, supra,* 68 N.Y.2d 432, the opinion cited by our Supreme Court in transferring this matter to us. The justices there observed, "Traditionally, the participant's conduct was conveniently analyzed in terms of the defensive doctrine of assumption of risk. With the enactment of the comparative negligence statute, however, . . . it has become necessary, and quite proper, when measuring a defendant's duty to a plaintiff to consider the risks assumed by the plaintiff [citations]. The shift in analysis is proper because the 'doctrine [of assumption of risk] deserves no separate existence (except for *express* assumption of risk) and is simply a confusing way of stating certain no-duty rules' (James, *Assumption of Risk: Unhappy Reincarnation,* 78 Yale L.J. 185, 187-188). Accordingly, the analysis of care owed to plaintiff in the professional sporting event by a coparticipant and by the proprietor of the facility in which it takes place must be evaluated by considering the risks plaintiff assumed when he elected to participate in the event and how those assumed risks qualified defendants' duty to him." (*Id.,* at pp. 437-438.) The opinion adds that the consent of a professional athlete "is not constructive consent; it is actual consent implied from the act of . . . electing to participate in the activity [citation]. When thus analyzed and applied, assumption of risk is not an absolute defense but a measure of the defendant's duty of care and thus survives the enactment of the comparative fault statute [citations]." (*Id.,* at p. 439.)

■ Thus, our reading of *Li* and the authorities discussed above convinces us that the doctrine of reasonable implied assumption of risk remains viable and, where applicable, provides a complete defense to a cause of action for personal injuries. This is so because the doctrine of reasonable implied assumption of risk, unlike its unreasonable sibling, involves a reduction of a defendant's duty of care. And if a defendant owes no duty, or a lesser one, his negligence provides a much narrower opening for a plaintiff's recovery of damages.

## III

■ Having concluded that the doctrine of reasonable implied assumption of risk is alive and well, we discuss in this section its preclusive impact on Casella's lawsuit, specifically whether her action could be maintained on a theory of recklessness. Her complaint presently makes no such claim, but her attorney has requested leave to amend to so allege. In the past we have treated summary judgment appeals as if they were from judgments on the pleadings and allowed leave to replead where an amendment could save the plaintiff's lawsuit. (See, e.g., *Blanch* v. *Young* (1984) 152 Cal.App.3d 1016, 1019-1020 [200 Cal.Rptr. 9].) For the reasons following, however, that procedure would be inappropriate here.

■ Historically, the doctrine of assumption of risk has provided a defense only to actions for negligence. It has little or no application in the case of intentional or reckless conduct.[5] The reason is this: While a potential plaintiff who engages in dangerous activity is "held to have consented to the injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation . . . participants do not consent to acts [by others] which are reckless or intentional." (*Turcotte* v. *Fell, supra,* 68 N.Y.2d at p. 439.) While the line between negligent and intentional conduct is frequently obscured in sports injury litigation, we are satisfied it was not crossed here.[6]

---

[5] "Reckless" in this context is a form of intentional conduct. (See discussion, *infra*.) It is not of the same species as negligence. (See, e.g.,*Continental Ins. Co.*v *American Protection Industries* (1987) 197 Cal.App.3d 322 [242 Cal.Rptr. 784] [no distinct cause of action for gross negligence exists in California] and Prosser & Keeton, Torts (5th ed. 1984) § 34, pp. 210-211 ["Although the idea of 'degrees of negligence' has not been without its advocates, it has been condemned by most writers, and, except in bailment cases, rejected at common law by nearly all courts, as a distinction 'vague and impracticable in nature, so unfounded in principle,' that it adds only difficulty and confusion to the already nebulous and uncertain standards which must be given to the jury. The prevailing rule in most situations is that there are no 'degrees' of care or negligence, as a matter of law; there are only different amounts of care as a matter of fact. From this perspective, 'gross' negligence is merely the same thing as ordinary negligence, 'with the addition,' as Baron Rolfe once put it, 'of a vituperative epithet.' "].)

[6] *Nabozny* v. *Barnhill* (1975) 31 Ill.App.3d 212 [334 N.E.2d 258, 77 A.L.R.3d 1294] exemplifies the confusion. A high school soccer goalie was injured when a rival player kicked him in the head as he held the ball within the 18-yard penalty area. He sued on a negligence theory, and the trial court directed a verdict for defendant.

Although the Illinois appellate court recognized the defendant was only "charged with negligence" (*id.,* at p. 260), its decision to reverse and remand for a new trial was based on the conclusion that sports participants may be liable for their *intentional* conduct: "[A] player is liable for injury in a tort action if his conduct is such that it is either deliberate, wilful or with a reckless disregard for the safety of the other player . . . ." (*Id.,* at p. 261.) We subscribe to the result. The plaintiff's negligence label, however, was inapt. A careless kick to the head may not provide a basis for recovery where kicking is the gist of the game and every participant will inevitably be kicked in various parts of the anatomy on occasion. Intentional

First, Casella's complaint alleged only that her injuries were caused by "the negligent, careless and unlawful manner in which the Defendants . . . rode, . . . owned and trained the horses, Over Shadow and Speedy Ball." She never used the words "reckless" or "intentional"; and neither expression would accurately characterize the defendant jockeys' conduct, as she herself described it. Her declaration in opposition to Ordway's motion for summary judgment explained, "[Over Shadow's jockey] severely guided his horse inside and in doing so crossed over and in front of other horses *without looking to see whether he could safely do so.* His horse crossed in front of [ ] Speedy Ball [whose jockey] did not take evasive action and the horses' legs tangled resulting in [ ] Speedy Ball tripping and falling onto the track . . . directly [in front of my mount]." (Italics added.) Casella's own assessment of the accident presents a classic case of negligence, i.e., a failure to exercise due care. But by participating in the horse race, she relieved others of any duty to conform their conduct to a standard that would exempt her from the risks inherent in a sport where large and swift animals bearing human cargo are locked in close proximity under great stress and excitement.

Casella seeks to avoid the negligence hurdle by equating suspension of one of the defendant jockeys for violation of California Horse Racing Board Rule No. 1699 (the equine equivalent of an unsafe lane change) with intentional conduct. We are not persuaded. Mens rea plays no part in the board rule. The penalty is levied when an infraction occurs; no evidence was presented to the trial court which suggested a jockey is suspended only where the conduct is determined to have been intentional.

Casella's allegations are legally indistinguishable from those found insufficient in *Turcotte* v. *Fell, supra,* 68 N.Y.2d 432. There, a jockey was injured in an accident very similar to Casella's. He sued his fellow competitor, who had been sanctioned for violating New York's foul riding rule, and the owner of the horse he rode. The trial court dismissed the complaint

or reckless conduct of the sort described in the appellate opinion must be involved before liability can attach.

In 1635, one Michael Dalton, writing *The Countrey Justice,* ruminated as follows: "Playing at Hand-Sword, Bucklers, Foot-ball, Wrestling, and the like, whereby one of them receiveth a hurt, and dieth thereof within a year and a day; in these cases, some are of the opinion, that this is Felony of Death: some others are of opinion, that this is no Felony of Death, but that they shall have their pardon, or course, as for misadventure, for that such their play was by consent, and again, there was no former intent to do hurt, or any former malice, but done only for disport, and triall of Man-hood." (Quoted in Note, *Consent in Criminal Law* (1976) 75 Mich L.Rev. 148, 169, fn. 78, spelling in the original text, of course.)

because there were "no allegations of [the defendant jockey's] wanton, reckless, or intentional conduct." (*Id.*, at p. 436.) The high court of New York unanimously affirmed the dismissal, noting the plaintiff's failure to allege intentional conduct by the defendant rider was fatal to his cause of action: "As the [foul riding] rule recognizes, bumping and jostling are normal incidents of the sport. They are not . . . flagrant infractions unrelated to the normal method of playing the game and done without any competitive purpose. Plaintiff does not claim that [the other jockey] intentionally or recklessly bumped him, he claims only that as a result of carelessness, [the defendant] failed to control his mount . . . . [A] professional clearly understands the usual incidents of competition resulting from carelessness, particularly those which result from the customarily accepted method of playing the sport, and accepts them. They are within the known, apparent and foreseeable dangers of the sport *and not actionable . . . .*" (*Id.*, at p. 441, italics added.)

Casella's allegations also stand in sharp contrast to the facts in two other recent professional sports injury actions, *Hackbart* v. *Cincinnati Bengals, Inc.* (10th Cir. 1979) 601 F.2d 516, certiorari denied, *sub. nom, Cincinnati Bengals, Inc.* v. *Hackbart* 444 U.S. 931 [62 L.Ed.2d 188, 100 S.Ct. 275] and *Tomjanovich* v. *California Sports, Inc.* (S.D. Tex., Oct. 10, 1979, No. 78-243).[7] In *Tomjanovich,* a professional basketball player was severely injured when an opposing player deliberately struck a vicious blow to his face. Tomjanovich sued in federal district court in Texas, and the law of California was applied. The verdict in his favor was in excess of $2 million. The matter settled pending appeal.

A verdict for Tomjanovich was clearly proper. He *did* assume the risk of being hit in the face by a flying elbow in the course of defending against an opponent's jump shot, suffering a painful insult to his instep by a size-16 foot descending with a rebound, or even being knocked to the court by the sheer momentum of a seven-footer driving home a slam dunk. But the scope of his consent did not extend to an intentional blow considerably beyond the expected risks inherent in basketball. Intentional fouls are part of that game. But where the intent is to injure and the force used is far greater than necessary to accomplish a legitimate objective within the scope of play, a defendant may not prevail on an assumption of risk defense.

---

[7]The federal district court's slip opinion in the action is not published. The case is, however, discussed at length in two law review articles (Comment, *Assumption of Risk and Vicarious Liability in Personal Injury Actions Brought by Professional Athletes* 1980 Duke L.J. 742 and Comment, *Tort Liability in Professional Sports* (1980) 44 Albany L.Rev. 696).

*Hackbart* is similar. There, a professional footballer on the ground and indisputably out of the action, watched as a fellow teammate, who had just intercepted a pass, ran toward the goal line. An opposing player, frustrated by the turn of events, dealt Hackbart a gratuitous forearm blow to the back of the head; and his neck was fractured. No penalty was called, but the incident was captured on film.

The trial court "ruled as a matter of law that the game of professional football is basically a business which is violent in nature, and that the available sanctions are imposition of penalties and expulsion from the game . . . [¶] . . . and concluded [Hackbart] had to recognize that he accepted the risk that he would be injured by [another player's intentional] act." (*Hackbart* v. *Cincinnati Bengals, Inc., supra,* 601 F.2d at p. 519.) The Tenth Circuit reversed and remanded for a new trial, holding the allegation of intentional conduct outside the legitimate parameters of the game was sufficient to state a cause of action for tort damages by a professional athlete.

The court of appeals' opinion also examined the distinctions between negligence, reckless misconduct, and intentional conduct. (See fn. 5, *ante*.) Negligence, it concluded, involved either a lack of skill or a "failure to take precautions." (*Id.,* at p. 524.) It termed recklessness, on the other hand, as "a lesser included act" of intentional conduct. (*Ibid.*) *Both* involve intentional conduct by the wrongdoer, the only difference between the concepts being one of degree: "[R]ecklessness exists where a person knows that the act is harmful but fails to realize that it will produce the extreme harm which it did produce. It is in this respect [only] that recklessness and intentional conduct differ . . . ." (*Ibid.*)

■ Despite Casella's disingenuous assertion that "I did not consider at the time of this race that I was participating in a dangerous activity," professional riders must realize that accidents are always possible and not uncommon. The degree of the risk anticipated varies, of course, from sport to sport. In prize fighting bodily harm is to be expected, but pugilists do not consent to be stabbed or shot in the ring. At the other extreme, in bridge or table tennis bodily harm is not contemplated at all. The correct rule is this: If the defendant's actions, even those which might cause incidental physical damage in some sports, are within the ordinary expectations of the participants—such as blocking in football, checking in hockey, knock-out punches in boxing, and aggressive riding in horse racing—no cause of action can

succeed based on a resulting injury.[8] It is of no moment that the participants may be penalized for these actions by the officials. Routine rule violations, such as clipping in football, low blows in boxing, and fouls in horse races are common occurrences and within the parameters of the athletes' expectations.

Here defendant jockeys were attempting to win a horse race. There has never been any suggestion that they, much less the owners of their horses, were motivated by a desire to injure plaintiff. Defendants' conduct, while perhaps negligent, was within the range to be anticipated by the other riders, or should have been. As a professional rider, Casella reasonably assumed the risk of her tragic injury. As with other persons who reasonably assume similar risks, her remedy was to purchase insurance from her athletic income beforehand, not to pursue a lawsuit against her counterparts in the sport afterward. The action, accordingly, is barred as a matter of law. Defendants are entitled to summary judgment.

The alternative writ is discharged. Let a peremptory writ issue directing the superior court to grant Ordway's motion for summary judgment and enter judgment in his favor accordingly.

Wallin, Acting P. J., and Sonenshine, J., concurred.

The petition of real party in interest Casella for review by the Supreme Court was denied April 7, 1988.

---

[8] A borderline situation is presented by knock-out punches in hockey. They are quite common, but not officially condoned as part of the game. Reasonable minds might differ as to them. Tossing one's opponent out of the ring in professional wrestling is also a gray area. These sorts of cases are jury material.