[No. B038772. Second Dist., Div. Two. Sept. 6, 1989.]

ROSA PRAYS, Plaintiff and Appellant, v.
LOLORNA PERRYMAN, Defendant and Respondent.

COUNSEL

Mason & Landis and Erich Hoerchner for Plaintiff and Appellant.

Cassidy, Warner, Brown, Combs & Thurber, David K. Thurber and Celeste Robertson for Defendant and Respondent.

## OPINION

**ROTH, P. J.**—In this dog bite case, plaintiff Rosa Prays appeals from the summary judgment granted defendant Lolorna Perryman on the ground of assumption of risk. The defense theory in essence is "since I am a dog, beware my fangs." (The Merchant of Venice, act III, scene iii.)

Defendant and her mother brought defendant's dog, a collie-Doberman mix, to H & A Feed and Pet Supplies, Inc., where plaintiff worked as a pet groomer. At her deposition, plaintiff, a Latvian immigrant, described the relevant events:

"A What happened, when I walked in the store, I was told there is a dog for me in a cage. And the owners, I didn't know who they were, they were leaving through the hallway. And when I went in the area I can hear the dog was growling and going crazy in the cage.

"That's the time I went back to get the owners and ask if they are the owners. And I asked them to come back. And that's when the conversation started. I asked them if there is something wrong with the dog because it looks to me like the dog can bite because he is growling and he is going crazy in the cage.

"And they are telling me that the dog didn't bite nobody before. So I told them that I am not going to take the dog out from the cage, and the reason I said I'm not going to do it is because I don't know their dog at all, and the way he do it is because I don't know their dog at all, and the way he act, he can bite. I said, 'If you want to take your dog out, and then we can see if the dog can be done, maybe, or maybe not, or are we going to take him home or are we going to muzzle him. We don't know. We only can see after we take the dog out from the cage and hold him. That's it.'

"Q And then they took the dog out of the cage?

"A Yeah, and the lady had him on the leash.

"Q And then what happened?

"A And then she said, 'Yes, he calms down.'

"Q Calms down?

"A 'The dog,' she said, 'is calming down. So maybe you will be friends.'

"And I said, 'I still cannot tell you that because the personality of the dog changes.' And I asked why the dog is so dirty, because usually when the dog is groomed regularly, they shouldn't look that way. And she said that she used to bathe him by herself, but now she can't do it anymore, it's too hard on her. I said, 'Oh, yeah? That's only the reason why?' I said, 'There is no other reasons?'

"And she says, 'No.'

"I said, 'Oh, okay. But still,' I said, 'I only can see in your presence if we will be able to do that dog,' I even told her, 'If we can,' because I didn't tell her even if I will because I have to see the way the dog will be.

"And she says, 'He's not growling anymore.'

"I said, 'That doesn't mean anything.' And by that time she was holding the dog on the leash, and I said, 'Okay, we'll see.' And at the same time, when I looked toward the dog, just like this, the dog jumped right in my face. That's how it happened.

". . . . . . . . . . . . . . . . . . .

"Q Did you make a request that the dog be muzzled?

"A At that time we even didn't discuss yet to get the dog to be done. I said, 'We will have to see,' I said, 'If the dog will be bathed, and you are going to have to stay here, be here all the time, even if we muzzle the dog. But you will muzzle the dog and not me.'

"And the reason why I said is because sometimes you can try to put the muzzle on the dog and the dog will bite you, but not bite the owner. So that's why. The owner never mentioned anything about the biting, never mentioned anything about the muzzling the dog. The one who told you that, that was me.

". . . . . . . . . . . . . . . . . .

"A I wanted to look at the dog, the way the dog will act, if he will growl at me or he won't, or if she will put the muzzle on the dog, and then I will put the dog on the table, because I have to put the dog on the table. But like I said, at that particular time I didn't even touch the dog for the whole time that the dog was in the store, I even didn't touch the dog with a finger."

Plaintiff's complaint alleged both negligence and strict liability. Civil Code section 3342 provides, in pertinent part: "The owner of any dog is liable for the damages suffered by any person who is bitten by the dog while in a public place or lawfully in a private place, including the property of the owner of the dog, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness."

■ The absolute language of the statute does not, however, preclude a defense of assumption of the risk. (See *Nelson* v. *Hall* (1985) 165 Cal.App.3d 709, 713 [211 Cal.Rptr. 668], citing cases.) *Nelson* affirmed a summary judgment for a dog owner because the dog was actively undergoing veterinary treatment at the moment it bit plaintiff, the veterinarian's assistant, who was holding the dog on the treatment table. The court reasoned that a veterinarian or a veterinary assistant, aware of the risk that any

dog, regardless of its previous docile nature, might bite while being treated, has assumed this risk as part of his profession, and that this type of assumption of the risk is not subsumed within comparative fault but rather is a complete defense. The court observed that it is the veterinarian who is in possession and control of the dog during treatment, determines the method of its treatment and handling, and is in the best position to take necessary precautions against injury.

In *Willenberg* v. *Superior Court* (1986) 185 Cal.App.3d 185 [229 Cal.Rptr. 625], the court applied the rule of *Nelson* to bar a claim by a veterinarian attacked by a dog which was sitting on the examination table awaiting treatment.

These decisions create, for veterinarians and their assistants, a variant of the fireman's rule. (See *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362 [182 Cal.Rptr. 629, 644 P.2d 822]; see also *Ordway* v. *Superior Court* (1988) 198 Cal.App.3d 98 [243 Cal.Rptr. 536] ("jockey's rule"); *Neinstein* v. *Superior Court* (1986) 185 Cal.App.3d 176 [229 Cal.Rptr. 612] ("baseball fan's rule").) The parties have spilt a good deal of ink arguing whether this "veterinarian's rule" should be extended to pet groomers. We need decide neither this point, however, nor whether a dog owner's defense of assumption of the risk would be impaired in a case where the owner, knowing his dog is vicious, lowers the veterinarian's or groomer's guard by giving false assurances to the contrary.

In *Nelson* the court noted: "This does not mean dog owners could *never* be held liable for injuries to veterinarians or their assistants. We emphasize that the defense of assumption of the risk extends only to the danger which the injured person has *knowingly* assumed; i.e., the danger the dog will bite *while being treated*." (165 Cal.App.3d at p. 715, fn. 4, italics in original.)

That caveat is applicable here. Plaintiff testified that at the time of the bite she was not grooming the dog and had told defendant she had not yet decided whether it was safe for her to do so. A trier of fact could find that the beast remained at all times under the exclusive control of defendant, who had uncaged it and was holding it on a leash. When defendant brought a growling dog into her shop, plaintiff was not required, to avoid assuming the risk of bloodshed, either to summarily eject the customer or to take flight.

Thus the trial court erred in ruling, as a matter of law, that plaintiff assumed the risk that the dog might attack her.

The judgment is reversed. Costs to appellant.

Compton, J., and Gates, J., concurred.