[No. S014828. Aug. 24, 1992.]

LARRY C. FORD, Plaintiff and Appellant v.
JACK GOUIN, Defendant and Respondent.

340

**COUNSEL**

Eric D. Carlyle for Plaintiff and Appellant.

Hurley, Grassini & Wrinkle, Ronald Wrinkle, Ian Herzog, Douglas Devries, Leonard Sachs, Bruce Broillet, Laurence Drivon, Robert Steinberg, Harvey R. Levine, David Harney, Suzanne Leibowitz, Leonard Esquina, Ronald Rouda, Evan Marshall and Darian Bojeaux as Amici Curiae on behalf of Plaintiff and Appellant.

Robinson & Wood, Jonathan L. Lee and Roberta M. Knapp for Defendant and Respondent.

Agajanian & McFall, Christopher J. Curtis, Cary J. C. Agajanian, Fred L. Main, Fred J. Hiestand, Bob Roberts, Hancock, Rothert & Bunshoft, Paul D. Nelson, Paul S. Rosenlund and Peter J. Koenig as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**ARABIAN, J.**—As in the companion case of *Knight* v. *Jewett, ante,* page 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (hereafter *Knight*), the issue in this case is whether plaintiff's cause of action, arising out of an injury allegedly caused by the negligence of a coparticipant in an active sport, is barred under the assumption of risk doctrine. As explained in *Knight,* in light of the adoption of comparative fault principles in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the assumption of risk doctrine operates as a complete bar to a plaintiff's action only in instances in which, in view of the nature of the activity at issue and the parties' relationship to that activity, the defendant's conduct did not breach a legal duty of care owed to the plaintiff. As *Knight* also explains, in general the legal duty applicable to a coparticipant in an active sport simply is a duty to avoid either intentionally injuring another participant or engaging in conduct so reckless as to bring it totally outside the range of the ordinary activity involved in the sport. A coparticipant in an active sport ordinarily bears no liability for an injury resulting from conduct in the course of the sport that is merely careless or negligent.

After summarizing the facts of this case, I shall proceed to apply the principles set out in *Knight, supra, ante,* at page 296, considering, in the process, whether a provision in the Harbors and Navigation Code prescribes the duty of care governing the liability of defendant on the facts of this case.

### I

On June 12, 1983, plaintiff Larry C. Ford was seriously injured while waterskiing in the "Warren Cut" channel of the Sacramento River Delta. At

the time of the accident, plaintiff was skiing barefoot and backward. He was injured when the back of his head struck a tree limb that extended over the channel from one of the riverbanks.

After the accident, plaintiff filed this action against defendant Jack Gouin, a friend of plaintiff, who, at the time of the accident, was driving the boat that towed plaintiff. In his complaint, plaintiff alleged that the accident was proximately caused by defendant's negligence in driving the boat too close to the riverbank.

After several depositions were taken, defendant filed a motion for summary judgment, asserting that even had he been negligent in driving the boat, plaintiff nonetheless was totally barred from bringing the action by the so-called "reasonable implied assumption of risk" doctrine, as reflected in the then-recent Court of Appeal decision in *Ordway* v. *Superior Court* (1988) 198 Cal.App.3d 98 [243 Cal.Rptr. 536] (*Ordway*). In support of his motion, defendant relied on the following concessions in plaintiff's deposition: (1) plaintiff was an experienced water-skier and had begun waterskiing barefoot and backward approximately two years prior to the time of the accident, although he had not yet mastered the technique and could not cross the wake without falling down; (2) plaintiff had selected the waterskiing site, had decided upon the length of the tow rope, and had skied on that stretch of water at least fifty times in the past; and (3) at the time of the accident, plaintiff was wearing a protective neck brace and other safety equipment and thus was aware the sport was risky. Defendant also relied on the declaration of an accident reconstruction expert who stated that the channel was only 120 feet wide at the point where the accident occurred, and that, in the expert's opinion, "the selection of this particular site by the plaintiff caused the accident in question."[1]

In opposing the summary judgment motion, plaintiff relied on the declaration of a water ski expert—a two-time national champion—who stated that (1) "it is the responsibility of the driver of the boat to watch out for the skier being towed, like a guide dog for a blind person [and] . . . to drive a course not dangerous to the skier," (2) he had skied in the same area—the Warren Cut—where plaintiff had been injured, and (3) in his opinion, the site "was a reasonably safe area in which to ski barefoot and backwards and was an area which provided an adequate and safe area of lateral movement, especially since the area of lateral movement when skiing barefoot and backwards is greatly reduced from the usual area when waterskiing forward with

---

[1] In his declaration, the accident reconstruction expert specifically indicated his opinion was based on the "assumption" the tree branch with which plaintiff collided extended 35 feet over the river. Other portions of defendant's summary judgment motion, however, disclosed a disparity in the eyewitnesses' estimates as to how far the tree branch extended over the river: defendant, himself, believed the tree extended only 10 to 15 feet from the shore, while another witness described the tree as extending anywhere between 10 and 35 feet from the shore.

skis." Plaintiff also relied on his own declaration reciting his familiarity with the area in which the accident occurred and stating that "there was plenty of room between the eastern and western shores, even if the width was 120 feet, to avoid the trees while skiing, if the driver had been steering a proper course." Finally, plaintiff relied on a portion of defendant's deposition acknowledging that, prior to the accident, defendant had driven water-skiers in the same area of the Warren Cut on more than five occasions.

After considering the parties' papers, the trial court granted summary judgment in favor of defendant. On appeal, the Court of Appeal affirmed the judgment. It concluded that (1) under *Li* v. *Yellow Cab Co.*, *supra*, 13 Cal.3d 804, the so-called "reasonable implied assumption of risk" doctrine may apply to totally bar a plaintiff's action, and (2) the doctrine was applicable because plaintiff, by voluntarily choosing to ski barefoot and backward in the Warren Cut, "impliedly assumed the risk [that the driver of his boat] might veer from a straight course and tow him in such a way he would collide with a branch overhanging the waterway . . . ."

Plaintiff sought review, noting that the Court of Appeal's endorsement of the "reasonable implied assumption of risk" doctrine conflicted with the earlier Court of Appeal decision in *Segoviano* v. *Housing Authority* (1983) 143 Cal.App.3d 162 [191 Cal.Rptr. 578], which rejected the doctrine. Plaintiff contended that even if such a doctrine should be recognized, it would be inapplicable in the present case, because a factual dispute existed at least as to whether plaintiff, in skiing backward and barefoot in a relatively narrow tree-lined channel, had acted "unreasonably" rather than "reasonably." In view of the conflict among the Courts of Appeal, we granted review.

## II

As we have explained at some length in *Knight*, *supra*, *ante* at page 296, the question whether plaintiff's action properly was barred under the assumption of risk doctrine does not depend on the reasonableness or unreasonableness of plaintiff's action in skiing backward and barefoot in a narrow tree-lined channel, nor on whether plaintiff subjectively knew of the specific risk of harm posed by defendant's allegedly negligent driving or impliedly consented to relieve or excuse defendant of a duty of care owed to plaintiff. Instead, the propriety of the summary judgment turns on whether defendant's alleged conduct breached the legal duty of care that defendant owed to plaintiff.

As in *Knight*, defendant was a coparticipant in the sports activity in which plaintiff was engaged when he was injured. Under the authorities discussed

in *Knight*, defendant, as a coparticipant, properly could be held liable only if he intentionally injured plaintiff or engaged in conduct that was so reckless as to be totally outside the range of the ordinary activities involved in the sport. In light of such a limited duty owing to plaintiff, it would clearly appear that summary judgment in favor of defendant properly was entered, because plaintiff's evidence indicates that defendant was, at most, careless in steering the boat.

■    Plaintiff argues, however, that although a rule limiting a coparticipant's duty of care to the avoidance of intentionally injurious or reckless conduct appropriately may be applied to a "competitive" sport such as the touch football game involved in *Knight*, such a limited duty should not apply in the context of a "cooperative" sport such as waterskiing. Although most of the prior authorities cited in *Knight* did involve sports that are played by competing teams, the rationale of those decisions is, in our view, equally applicable to an active sport such as waterskiing even when it is engaged in on a noncompetitive basis.

As noted in *Knight*, the decisions that have recognized the existence of only a limited duty of care in a sports situation generally have reasoned that vigorous participation in the sport likely would be chilled, and, as a result, the nature of the sport likely would be altered, in the event legal liability were to be imposed on a sports participant for ordinary careless conduct. (*Knight, supra, ante*, at p. 318.) This reasoning applies to waterskiing. Even when a water-skier is not involved in a "competitive" event, the skier has undertaken vigorous, athletic activity, and the ski boat driver operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the active conduct of the sport. Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports. As a result, holding ski boat drivers liable for their ordinary negligence might well have a generally deleterious effect on the nature of the sport of waterskiing as a whole. Additionally, imposing such liability might well deter friends from voluntarily assisting one another in such potentially risky sports. Accordingly, the general rule limiting the duty of care of a coparticipant in active sports to the avoidance of intentional and reckless misconduct, applies to participants engaged in noncompetitive but active sports activity, such as a ski boat driver towing a water-skier. Under the principles set forth in *Knight*, summary judgment in favor of defendant was properly entered.

## III

Although neither party raised the matter in the trial court or on appeal, in the course of our consideration of this case we discovered a statute, Harbors and Navigation Code section 658, subdivision (d), which appeared on its face to have potential bearing on the scope of the duty applicable to defendant in this case. ▮▮▮ ▪ ▪ The court requested, and received, supplemental briefing from the parties with regard to the effect of the statute.[2]

Harbors and Navigation Code section 658, subdivision (d), provides in full: "No person shall operate or manipulate any vessel, towrope, or other device by which the direction or location of water skis, an aquaplane, or a similar device may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon, to collide with, or strike against, any object or person. This subdivision does not apply to collisions of two or more persons on water skis, aquaplanes, or similar devices being towed by the same vessel."[3]

▮ Plaintiff contends it is clear from the undisputed facts that defendant violated the provisions of section 658, subdivision (d), and further maintains that, under the provisions of Evidence Code section 669, such a violation establishes a rebuttable presumption that defendant breached his duty of care to plaintiff. Evidence Code section 669 provides, in relevant part: "(a) The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. [¶] (b) This presumption may be rebutted by proof that: [¶] (1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law . . . ."

---

[2] Although the statute was not cited or relied on in the trial court, it is appropriate for us to consider the provision in determining the legal issue of the existence and scope of the duty owed by a ski boat driver to a towed water-skier. The matter is one of general public significance and interest, affecting all persons in the state engaged in waterskiing, and presents a pure question of law. (See, e.g., *Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664]; *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512]; *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

[3] Hereafter, unless otherwise indicated, all section references are to the Harbors and Navigation Code.

Defendant, on a number of grounds, takes issue with plaintiff's contention that section 658, subdivision (d), is applicable to the facts of this case, arguing that (1) the undisputed evidence demonstrates it was plaintiff's conduct, rather than defendant's control of the ski boat, that "caused" plaintiff to collide with the tree, and (2) the statute is inapplicable because plaintiff was not on "water skis, an aquaplane, or similar device" when he collided with the tree, but rather was skiing barefoot. In my view, neither of these arguments can withstand analysis.

In asserting that the declarations in support of and in opposition to the summary judgment motion establish, as a matter of law, that it was plaintiff's, rather than defendant's, conduct that caused the collision, defendant points out it is undisputed that plaintiff (1) chose the site for the skiing and the length of the tow rope, (2) chose to ski backwards, and (3) was in control of the angle at which he skied. But although these facts certainly would be sufficient to enable the trier of fact to find it was plaintiff himself who was the sole cause of his injuries, the facts asserted in plaintiff's declarations raise a factual dispute as to whether defendant's steering of the boat was at least a contributing cause of the collision. Plaintiff's declaration specifically states that "[o]n the date of the accident, I was not skiing more than a 45 [degree] angle from the boat; and most likely skiing within only a 35 [degree] angle from the boat," that "there was plenty of room between the eastern and western shores, even if the width was 120 feet, to avoid the trees while skiing, if the driver had been steering a proper course," and that "[d]efendant drove too close to the shore on one side." Thus, on the basis of the declarations, there clearly is a factual dispute as to whether defendant's manner of controlling the ski boat was a cause of the accident.

Indeed, at the initial hearing on the summary judgment motion, defendant's counsel so conceded, telling the court that, for purposes of the motion, "I have asked the Court to assume [defendant's] negligence," and maintaining that under the *Ordway* decision, *supra*, 198 Cal.App.3d 98, defendant was entitled to summary judgment even if his negligence had played some role in plaintiff's injury. Accordingly, I am unable to conclude section 658, subdivision (d), is inapplicable on the ground that defendant, as a matter of law, did not operate the vessel "so as to cause" the collision within the meaning of the statute.

Defendant next contends that section 658, subdivision (d), is inapplicable because plaintiff was skiing barefoot, rather than on water skis, at the time of the accident. Defendant maintains the language of the statute, which provides that "[n]o person shall operate . . . any vessel, towrope, or other device by which the direction or location *of water skis, an aquaplane, or a*

*similar device* may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon, to collide with, or strike against, any object or person," (*ibid.*, italics added) properly should be interpreted as being inapplicable to a barefoot water-skier. Defendant acknowledges that in 1987 the Legislature added a provision to the applicable definitional section of the Harbors and Navigation Code that specifically defines the phrase "water skis, an aquaplane, or a similar device" to include "all forms of waterskiing, *barefoot skiing*, . . . or any activity where a person is towed behind or alongside a boat" (Stats. 1987, ch. 745, § 7, pp. 2363-2364, enacting former § 651, subd. (t), now § 651, subd. (z), italics added), but defendant points out that the accident in this case occurred in 1983 and contends that the 1987 legislation should not apply retroactively. Because the phrase "water skis, an aquaplane, or a similar device" was not specifically defined to include "barefoot skiing" in 1983, defendant contends that, at the time of plaintiff's injury, section 658, subdivision (d), did not apply to barefoot skiing.

The argument is unpersuasive. Viewing the statutory language of section 658, subdivision (d), as a whole, and considering the evident legislative intent underlying the statutory provision, we conclude that even before the 1987 legislation, section 658, subdivision (d), clearly was intended to apply to barefoot waterskiing, and that the phrase "water skis, aquaplane, *or similar device*" encompassed bare feet when used for waterskiing. Nothing in the statute, as it existed in 1983, suggests that the Legislature intended to impose a duty on a ski boat driver to operate the vessel in a manner so as to avoid causing a person on skis from colliding with a swimmer, but did not intend to impose a similar duty to avoid towing a barefoot skier into the swimmer. Defendant's suggested interpretation to the contrary would defeat the obvious legislative purpose of the statute and must be rejected. ■ "Rules of statutory construction require courts to construe a statute to promote its purpose, render it reasonable, and avoid absurd consequences." (*In re Atiles* (1983) 33 Cal.3d 805, 810, fn. 4 [191 Cal.Rptr. 452, 662 P.2d 910].)

Although neither of the arguments advanced by defendant establishes the inapplicability of section 658, subdivision (d), there is another argument that merits serious consideration in determining whether section 658, subdivision (d), prescribes the duty of care applicable to defendant in this case. As already noted, under Evidence Code section 669, a statutory violation gives rise to a presumption that the violator has failed to exercise due care only if "[t]he person suffering . . . the injury . . . was one of the class of persons for whose protection the statute . . . was adopted." (Evid. Code, § 669, subd. (a)(4).) The question thus raised is whether section 658, subdivision

(d), was adopted only for the protection of third persons with whom a water-skier might collide or whose property might be damaged by a collision with water skis, an aquaplane, or the water-skier, or whether, instead, the statute also was intended to protect water-skiers themselves from collisions caused by their boat drivers.

The language of section 658, subdivision (d), provides no clear answer to this question. It appears from the initial sentence of the subdivision that the provision was intended to impose a duty on both ski boat operators and water-skiers to operate any device within each party's control in a manner so as to avoid a collision with any object or person. Thus, water-skiers are within the class of persons *whose conduct the statute was intended to regulate*. Whether water-skiers also are within the class of persons *whom the statute was intended to protect* is another matter.

Although the first sentence of section 658, subdivision (d), which refers to "any object or person," appears sufficiently broad to include water-skiers themselves within the protected class, the concluding sentence, which provides that the subdivision "does not apply to collisions of two or more persons on water skis . . . being towed by the same vessel," suggests that the statute was not designed to create a duty of care on the part of the driver of the vessel to the persons being towed. This conclusion appears to be even more reasonable when subdivision (d) is considered in the context of other subdivisions of section 658.[4]

---

[4]Section 658 provides in full:

"(a) No person shall operate a vessel on any waters for towing a person or persons on water skis, an aquaplane, or a similar device unless there is in the vessel a person at least 12 years of age, in addition to the operator, in a position to observe the progress of the persons being towed.

"This subdivision does not apply to motorboats less than 16 feet in length actually operated by the person or persons being towed and so constructed as to be incapable of carrying the operator in or on the motorboat. The department may establish rules and regulations governing the operation of those watercraft, which rules and regulations shall provide the greatest possible safety of persons and vessels.

"(b) No person shall operate a vessel on any waters of this state towing a person or persons on water skis, an aquaplane, or a similar device nor shall any person engage in waterskiing, aquaplaning, or other similar activity at any time between the hours from sunset to sunrise, except that those hours do not apply to those waters of this state as to which prohibited hours for those activities are fixed by local ordinances, laws, or regulations enacted pursuant to this chapter.

"(c) Subdivisions (a) and (b) of this section do not apply to a performer engaged in a professional exhibition or a person or persons engaged in a regatta, vessel or water ski race, or other marine event authorized pursuant to Section 268.

. "(d) No person shall operate or manipulate any vessel, towrope, or other device by which the direction or location of water skis, an aquaplane, or a similar device may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon,

As noted above, section 658, subdivision (d), imposes a duty on the *operator of the vessel* not to cause a collision between the person towed and "any object or person." Subdivision (e) of section 658 imposes a corresponding duty on the *water-skier* not to "endanger the life, limb or property, of any person." Obviously, the class of persons protected by subdivision (e) is limited to third parties and their property, since the water-skier is in no position to harm anyone else. It seems reasonable to conclude that subdivision (d) serves as a complementary provision to subdivision (e), imposing a similar duty on the driver of the vessel not to cause a collision with any third person or object.

In his concurring and dissenting opinion, Justice George suggests that subdivision (a) of section 658 supports a contrary conclusion. That provision states that "[n]o person shall operate a vessel . . . for towing a person or persons on water skis . . . unless there is in the vessel a person at least 12 years of age, in addition to the operator, in a position to observe the progress of the persons being towed." Although I agree that this subdivision shows that water-skiers are within the class of persons the statute was designed to regulate, the issue is whether they are within the class of persons the statute was intended to protect. In my view, requiring a spotter in the boat to observe the progress of the person being towed is plausibly interpreted as a measure to ensure that drivers do not inadvertently steer water-skiers into the path of third persons or objects. Viewing the statute as a whole, this appears to be the most reasonable construction.[5]

In sum, I conclude that section 658, subdivision (d), was intended to safeguard only the lives and property of third persons. Plaintiff does not fall within this protected class. (Evid. Code, § 669.) Accordingly, the statute does not impose a duty of care on defendant that is otherwise precluded under the principles set forth in *Knight, supra, ante,* at page 296.

---

to collide with, or strike against, any object or person. This subdivision does not apply to collisions of two or more persons on water skis, aquaplanes, or similar devices being towed by the same vessel.

"(e) No person shall operate water skis, an aquaplane, or a similar device so as to endanger the life, limb, or property of any person."

[5] I have reviewed the legislative history to which Justice George refers (*post,* p. 368) and find it, at best, inconclusive. Although there is a reference in the Senate Report to "protecting . . . those who participate," this is followed immediately by an injunction that the statute "should, above all, be sensible, practical, and flexible." (Sen. Interim Com. Rep. on Bay Development and Small Boat Harbors, p. 22, 1 Appen. to Sen. J. (1957 Reg. Sess.).) It is difficult to see how extending a duty of care to water-skiers who ski barefoot and backwards can be described as "sensible."

Justice Kennard's concurring opinion asserts that I am "bothered" by the result in this case and misconstrue the meaning of section 658. As she otherwise fails to engage the issue, no detailed response is necessary. There is no need to sink that which does not float.

As plaintiff's action was clearly barred by the doctrine of assumption of risk, I conclude that the Court of Appeal properly affirmed the summary judgment in favor of defendant.

The judgment of the Court of Appeal is affirmed.[6]

**KENNARD, J., Concurring.**—I join Justice Arabian in affirming the judgment of the Court of Appeal in favor of defendant. Unlike Justice Arabian, however, I do not resolve this case on the meaning of a provision of the Harbors and Navigation Code. Instead, I conclude that it is properly resolved under settled principles governing the defense of implied assumption of risk that California courts have followed for more than 50 years.

This case presents a classic example of implied assumption of risk: plaintiff, an experienced water-skier, skied barefoot and backward in a narrow tree-lined channel where he had skied before; he owned the boat and the rope towing him, he selected the site and the speed; and he knew that this manner of skiing prevented him from crossing from one side of the boat to the other to avoid colliding with overhanging tree branches. Plaintiff's voluntary decision to engage in an activity that he knew to be dangerous should bar him from suing the ski boat driver for the harmful consequences resulting from the choice plaintiff made.

. We granted review in this case and its companion, *Knight* v. *Jewett, ante*, page 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (hereafter *Knight*), to decide the fate of the implied assumption of risk defense in light of our adoption of a system of comparative fault in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (hereafter *Li*). No single view has garnered a majority.[1] As I explained in my dissenting opinion in *Knight*, I adhere to the traditional approach to implied assumption of risk under which a plaintiff's voluntary choice to confront a known risk will bar recovery in an action for negligence. The doctrine of assumption of risk recognizes that liberty implies responsibility and that respect for choices freely made is enhanced, not diminished, when one who voluntarily confronts a specific, known risk is precluded from shifting to another the costs of an injury that is the direct result of that choice.

The justices who joined the plurality opinion in *Knight* do not accept my conclusion that, in its traditional form, the defense of implied assumption of

[6]As the preceding discussion makes clear, although I agree with Justice Kennard that the judgment of the Court of Appeal should be affirmed, I do not share her views of the assumption of risk doctrine set forth in her concurring opinion in this case and her dissenting opinion in *Knight, supra, ante* at page 324.

[1]Three justices embrace the primary/secondary approach to implied assumption of risk, three justices adhere to the traditional consent approach, and one justice would openly abolish the doctrine.

risk survived *Li.* Instead, as I pointed out in my dissenting opinion in *Knight, supra, ante* at page 324, they propose to recast assumption of risk from a defense involving the plaintiff's implied consent to confront a specific, known risk into a determination of the presence or absence of duty. Under the plurality's approach, the separate concepts of duty of care (an element of the plaintiff's case) and assumption of risk (an affirmative defense) are somehow thought to be the same thing. Only in those situations in which the *Knight* plurality concludes that the defendant owes no duty to the plaintiff would the plurality bar recovery. In situations in which the defendant does owe the plaintiff a duty of care, however, the plurality would recognize only a partial defense indistinguishable from the doctrine of comparative fault. But the *Knight* plurality's approach fails to take into account cases like this one, where a duty is imposed by statute on the defendant.

Thus, because of their conclusion that assumption of risk is nothing more than the absence of duty, the justices forming the plurality in *Knight, ante,* are in this case forced to take positions that defy either logic or common sense. Bothered by the result he would be compelled to reach under the analysis he embraced in *Knight,* Justice Arabian here misconstrues a provision of the Harbors and Navigation Code to hold that the statutory duty imposed on ski boat drivers to avoid collisions does not extend to the skiers they tow, but protects only third parties and their property. As construed by Justice Arabian, the statute imposes on defendant ski boat driver a duty to avoid injury not to the water-skier he towed, but to the tree with which the water-skier collided. The Chief Justice and Justice George, on the other hand, bound by their correct conclusion that the statutory duty runs to the skier being towed, must disregard the risk assumption implicit in plaintiff's freely made choice to engage in conduct he knew to be dangerous.[2]

The facts of this case well illustrate the flawed approach advanced by the *Knight* plurality and, in my view, demonstrate convincingly why the courts of this state should continue to do what they have done for the past 50 years: apply the doctrine of implied assumption of risk in its traditional form as a complete defense in an action for negligence.

---

[2]The conclusion reached by the Chief Justice and Justice George here stands in sharp contrast to their resolution of the companion case of *Knight* and further demonstrates why consideration of the plaintiff's decision to engage in risktaking is superior to the duty approach. Here, the existence of a statutory duty would, under these justices' view, compel a jury trial on the question of defendant ski boat driver's liability despite plaintiff water-skier's knowing and voluntary choice to engage in highly dangerous activity. In *Knight,* however, where the injured plaintiff was merely a participant in a casual, recreational game using a child's "peewee" football, these same justices bar the plaintiff's recovery by concluding that the defendant owed plaintiff no duty to avoid the conduct that caused her injury—defendant's unexpectedly aggressive manner of play.

I

Plaintiff Larry C. Ford decided to water-ski barefoot and backward in the Warren Cut Slough, a narrow channel in the Delta area of Contra Costa County. Jack Gouin, Ford's friend, agreed to drive the boat to which the 95-foot tow rope would be fastened. Ford owned the boat and the rope; he gave the driving instructions, including the speed, which was about 40 miles per hour. Ford had skied barefoot and backward some 50 times, but he had not yet learned to cross the wake, and so he could ski only on the left side of the boat.

The Warren Cut is approximately 170 feet wide, but a sandbar near the place of the accident narrows the main channel to a width of 120 feet. Across the main channel from the sandbar, large tree branches overhang the water. Ford hit a branch of one of these trees, and suffered serious injuries. Witnesses estimated that the tree branch Ford hit extended 10 to 35 feet into the channel.

In support of his motion for summary judgment, defendant Gouin submitted declarations by an accident reconstruction expert stating that the driver of the tow boat could have navigated no closer than 20 feet to the sandbar, leaving only 65 feet between the boat and a 35-foot overhanging branch. The expert calculated that a skier using a 95-foot rope and skiing at a 35.4-degree angle would be 55 feet from the boat's extended midline, a distance that would increase to 67.2 feet at an angle of 45 degrees. Under these calculations, there was at best little room for error; someone skiing at a 45-degree angle would be directly in the path of a 35-foot overhanging branch, even when the tow boat was as close as possible to the sandbar on the opposite side of the channel.

In response to Gouin's motion for summary judgment, Ford did not offer any evidence to dispute the measurements and calculations made by the defense expert. Ford did submit his own declaration. Although he had testified during his deposition that he did not remember the accident at all, he said in his declaration that at the time of the accident he was "not skiing more than a 45 [degree] angle" and "most likely" was skiing within an angle of 35 degrees from the boat's midline. He also said that Gouin "drove too close to the shore on one side" (that is, too close to the overhanging tree branch).

Ford also submitted the declaration of champion water-skier Tom Huey. Based on his personal familiarity with the Warren Cut, Huey expressed his opinion that it was a "reasonably safe area in which to ski barefoot and

backward." According to Huey, the boat driver must steer a safe course and watch out for the skier.

The trial court granted summary judgment for Gouin. On plaintiff Ford's appeal, the Court of Appeal affirmed, holding that, by planning and engaging in activity that left only the narrowest margin for error, Ford had impliedly assumed the risk of being injured should Gouin veer slightly off course and thereby cause Ford to collide with an overhanging tree branch.

## II

My dissenting opinion in the companion case of *Knight* v. *Jewett, supra, ante* at page 324 describes the traditional definition and principles underlying the implied assumption of risk defense that has been established by a long line of California cases, and explains in some detail why the defense survives this court's decision in *Li, supra,* 13 Cal.3d 804. Because, in my view, this case is governed by the principles that I discussed in *Knight,* I repeat that discussion here.[3]

In California, the affirmative defense of assumption of risk has traditionally been defined as the voluntary acceptance of a specific, known and appreciated risk that is or may have been caused or contributed to by the negligence of another. (*Prescott* v. *Ralphs Grocery Co.* (1954) 42 Cal.2d 158, 162 [265 P.2d 904]; see *Hayes* v. *Richfield Oil Corp.* (1952) 38 Cal.2d 375, 384-385 [240 P.2d 580].) Assumption of risk may be proved either by the plaintiff's spoken or written words (express assumption of risk), or by inference from the plaintiff's conduct (implied assumption of risk). Whether the plaintiff knew and appreciated the specific risk, and voluntarily chose to encounter it, has generally been a jury question. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1110, p. 523.)

The defense of assumption of risk, whether the risk is assumed expressly or by implication, is based on consent. (*Vierra* v. *Fifth Avenue Rental Service* (1963) 60 Cal.2d 266, 271 [32 Cal.Rptr. 193, 383 P.2d 777]; see Prosser & Keeton, Torts (5th ed. 1984) § 68, p. 484.) Thus, in both the express and implied forms, the defense is a specific application of the maxim that one "who consents to an act is not wronged by it." (Civ. Code, § 3515.) This consent, we have explained, "will negative liability" (*Prescott* v. *Ralphs Grocery Co., supra,* 42 Cal.2d 158, 161; see also *Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 498, fn. 10 [102 Cal.Rptr. 795, 498 P.2d 1043] ["In assumption of the risk the negligent party's liability is negated . . . ."]), and thus provides a complete defense to an action for negligence.

---

[3]The remainder of the discussion in part II is quoted from *Knight* v. *Jewett.*

The elements of implied assumption of risk deserve some explanation. To establish the defense, a defendant must prove that the plaintiff voluntarily accepted a risk with knowledge and appreciation of that risk. (*Prescott* v. *Ralphs Grocery Co.*, *supra*, 42 Cal.2d 158, 161.) The normal risks inherent in everyday life, such as the chance that one who uses a public highway will be injured by the negligence of another motorist, are not subject to the defense, however, because they are general rather than specific risks. (See *Hook* v. *Point Montara Fire Protection Dist.* (1963) 213 Cal.App.2d 96, 101 [28 Cal.Rptr. 560].)

The defense of implied assumption of risk depends on the plaintiff's "actual knowledge of the specific danger involved." (*Vierra* v. *Fifth Avenue Rental Service*, *supra*, 60 Cal.2d 266, 274.) Thus, one who "knew of the general danger in riding in a bucket of the mine owner's aerial tramway, did not assume the risk, of which he *had no specific knowledge*, that the traction cable was improperly spliced." (*Id.* at p. 272, italics added, referring to *Bee* v. *Tungstar Corp.* (1944) 65 Cal.App.2d 729, 733 [151 P.2d 537]; see also *Carr* v. *Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 542-543 [103 Cal.Rptr. 120].) A defendant need not prove, however, that the plaintiff "had the clairvoyance to foresee the exact accident and injury which in fact occurred." (*Sperling* v. *Hatch* (1970) 10 Cal.App.3d 54, 61 [88 Cal.Rptr. 704].) "Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge and there may be an assumption of the risk . . . ." (*Prescott* v. *Ralphs Grocery Co.*, *supra*, 42 Cal.2d at 162.) Indeed, certain well-known risks of harm may be within the general "common knowledge." (*Tavernier* v. *Maes* (1966) 242 Cal.App.2d 532, 546 [51 Cal.Rptr. 575].)

As set forth earlier, a person's assumption of risk must be voluntary. "The plaintiff's acceptance of a risk is not voluntary if the defendant's tortious conduct has left him [or her] no reasonable alternative course of conduct in order to [¶] (a) avert harm to himself [or herself] or another, or [¶] (b) exercise or protect a right or privilege of which the defendant has no right to deprive him [or her]." (Rest.2d Torts, § 496E, subd. (2); see also *Curran* v. *Green Hills Country Club* (1972) 24 Cal.App.3d 501, 505-506 [101 Cal.Rptr. 158].)

This requirement of voluntariness precludes assertion of the defense of assumption of risk by a defendant who has negligently caused injury to another through conduct that violates certain safety statutes or ordinances such as those designed to protect a class of persons unable to provide for their own safety for reasons of inequality of bargaining power or lack of knowledge. (See *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 430-431 [218 P.2d 17] [violation of fire-safety ordinance]; *Fonseca* v. *County of*

*Orange* (1972) 28 Cal.App.3d 361, 366, 368 [104 Cal.Rptr. 566] [violation of safety order requiring scaffolding and railings at bridge construction site]; see also *Mason* v. *Case* (1963) 220 Cal.App.2d 170, 177 [33 Cal.Rptr. 710].) Thus, a worker who, to avoid loss of livelihood, continues to work in the face of safety violations does not thereby assume the risk of injury as a result of those violations. (See, e.g., Lab. Code, § 2801; *Fonseca* v. *County of Orange, supra,* 28 Cal.App.3d 361.) In such cases, the implied agreement upon which the defense is based is contrary to public policy and therefore unenforceable.

Our 1975 decision in *Li, supra,* 13 Cal.3d 804, marked a fundamental change in California law governing tort liability based on negligence. Before *Li,* a person's own lack of due care for his or her safety, known as contributory negligence, completely barred that person from recovering damages for injuries inflicted by the negligent conduct of another. In *Li,* we held that a lack of care for one's own safety would no longer entirely bar recovery, and that juries thereafter should compare the fault or negligence of the plaintiff with that of the defendant to apportion loss between the two. (*Id.* at pp. 828-829.)

Before it was abolished by *Li, supra,* 13 Cal.3d 804, the defense of contributory negligence was sometimes confused with the defense of implied assumption of risk. Although this court had acknowledged that the two defenses may "arise from the same set of facts and frequently overlap" (*Vierra* v. *Fifth Avenue Rental Service, supra,* 60 Cal.2d 266, 271), we had emphasized that they were nonetheless "essentially different" (*ibid.*) because they were "based on different theories" (*Prescott* v. *Ralphs Grocery Co., supra,* 42 Cal.2d 158, 161). Contributory negligence was premised on a lack of due care or, stated another way, a departure from the reasonable person standard, whereas implied assumption of risk has always depended on a voluntary acceptance of a risk with knowledge and appreciation of that risk. (*Id.* at pp. 161-162; *Gonzalez* v. *Garcia* (1977) 75 Cal.App.3d 874, 878 [142 Cal.Rptr. 503].)

The standards for evaluating a plaintiff's conduct under the two defenses were entirely different. Under contributory negligence, the plaintiff's conduct was measured against the objective standard of a hypothetical reasonable person. (*Gonzalez* v. *Garcia, supra,* 75 Cal.App.3d 874, 879.) Implied assumption of risk, in contrast, has always depended upon the plaintiff's subjective mental state; the relevant inquiry is whether the plaintiff actually knew, appreciated, and voluntarily consented to assume a specific risk of injury. (*Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 243-245 [53 Cal.Rptr. 545, 418 P.2d 153].)

We said in *Li*, albeit in dictum, that our adoption of a system of comparative fault would to some extent necessarily impact the defense of implied assumption of risk. (*Li, supra*, 13 Cal.3d 804, 826.) We explained: "As for assumption of risk, we have recognized in this state that this defense overlaps that of contributory negligence to some extent and in fact is made up of at least two distinct defenses. 'To simplify greatly, it has been observed . . . that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he [or she] may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . . Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him [or her]. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care.' [Citations.] We think it clear that the adoption of a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence." (*Li, supra*, 13 Cal.3d 804, 824-825, original italics.)

Although our adoption in *Li* of a system of comparative fault eliminated contributory negligence as a separate defense, it did not alter the basic attributes of the implied assumption of risk defense or call into question its theoretical foundations, as we affirmed in several cases decided after *Li*. For example, in *Walters* v. *Sloan* (1977) 20 Cal.3d 199 [142 Cal.Rptr. 152, 571 P.2d 609], we said that "one who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby." (At p. 204; see also *Ewing* v. *Cloverleaf Bowl* (1978) 20 Cal.3d 389, 406 [143 Cal.Rptr. 13, 572 P.2d 1155] [acknowledging the continued viability of the assumption of risk defense after the adoption of comparative fault].) Thereafter, in *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362 [182 Cal.Rptr. 629, 644 P.2d 822], we reiterated that "the defense of assumption of risk arises when the plaintiff voluntarily undertakes to encounter a specific known risk imposed by defendant's conduct." (At p. 375, fn. 8.)

The Courts of Appeal directly addressed this issue in several cases, which were decided after *Li, supra*, 13 Cal.3d 804, and which considered whether, and to what extent, implied assumption of risk as a complete defense survived our adoption in *Li* of a system of comparative fault. The first of these cases was *Segoviano* v. *Housing Authority* (1983) 143 Cal.App.3d 162 [191 Cal.Rptr. 578] (hereafter *Segoviano*).

In *Segoviano*, the plaintiff was injured during a flag football game when an opposing player pushed him to the ground as the plaintiff was running

along the sidelines trying to score a touchdown. Although the jury found that the opposing player was negligent, and that this negligence was a legal cause of the plaintiff's injury, it also found that the plaintiff's participation in the game was a negligent act that contributed to the injury. Applying the instructions it had been given on comparative negligence, the jury apportioned fault for the injury between the two players and reduced the plaintiff's award in accord with that apportionment. (*Id.* at p. 166.)

To determine whether the jury had acted properly in making a comparative fault apportionment, the *Segoviano* court began its analysis by distinguishing those cases in which the plaintiff's decision to encounter a known risk was "unreasonable" from those in which it was "reasonable." (*Segoviano, supra,* 143 Cal.App.3d 162, 164.) In so doing, *Segoviano* relied on this court's language in *Li* [] that a plaintiff's conduct in "unreasonably" undertaking to encounter a specific known risk was "a form of contributory negligence" that would be merged "into the general scheme of assessment of liability in proportion to fault." (*Li, supra,* 13 Cal.3d 804, 824-825.)

The *Segoviano* court defined an "unreasonable" decision to encounter a known risk as one that "falls below the standard of care which a person of ordinary prudence would exercise to avoid injury to himself or herself under the circumstances." (*Segoviano, supra,* 143 Cal.App.3d 162, 175, citing Rest.2d Torts, § 463.) The *Segoviano* court cited a person's voluntary choice to ride with a drunk driver as an example of an "unreasonable" decision. (*Id.* at p. 175; see *Gonzalez* v. *Garcia, supra,* 75 Cal.App.3d 874, 881; *Paula* v. *Gagnon* (1978) 81 Cal.App.3d 680, 685 [146 Cal.Rptr. 702].) Because an "unreasonable" decision to risk injury is neglect for one's own safety, the *Segoviano* court observed, a jury can appropriately compare the negligent plaintiff's fault with that of the negligent defendant and apportion responsibility for the injury, applying comparative fault principles to determine the extent of the defendant's liability. (*Segoviano, supra,* at pp. 164, 170.)

By contrast, the plaintiff's decision to play flag football was, in the *Segoviano* court's view, an example of a "reasonable" decision to encounter a known risk of injury. Although the risk of being injured during a flag football game could be avoided altogether by choosing not to play, this did not render the plaintiff's decision to play "unreasonable." (*Segoviano, supra,* 143 Cal.App.3d 162, 175.) Rather, the court said, a person who participates in a game of flag football is not negligent in doing so, because the choice does not fall below the standard of care that a person of ordinary prudence would exercise to avoid being injured. The *Segoviano* court concluded that such cases, in which there is no negligence of the plaintiff to compare with the negligence of the defendant, cannot be resolved by comparative fault apportionment of the plaintiff's damages. (*Id.* at pp. 174-175.)

The *Segoviano* court next considered whether the defense of implied assumption of risk, to the extent it had not merged into comparative fault, continued to provide a complete defense to an action for negligence following our decision in *Li* (*supra*, 13 Cal.3d 804). The court asked, in other words, whether a plaintiff's voluntary and nonnegligent decision to encounter a specific known risk was still a complete bar to recovery, or no bar at all.

In resolving this issue, the court found persuasive a commentator's suggestion that " 'it would be whimsical to treat one who has unreasonably assumed the risk more favorably . . . than one who reasonably assumed the risk . . . .' " (*Segoviano, supra*, 143 Cal.App.3d 162, 169, quoting Fleming, *The Supreme Court of California 1974-1975, Forward: Comparative Negligence at Last—By Judicial Choice* (1976) 64 Cal.L.Rev. 239, 262.) To avoid this "whimsical" result, in which "unreasonable" plaintiffs were allowed partial recovery by way of a comparative fault apportionment while "reasonable" plaintiffs were entirely barred from recovery of damages, the *Segoviano* court concluded that our decision in *Li, supra*, 13 Cal.3d 804, must mean that the defense of implied assumption of risk had been abolished in all those instances in which it had not merged into the system of comparative fault, and that only express assumption of risk survived as a complete defense to an action for negligence. (*Segoviano, supra*, 143 Cal.App.3d 162, 169-170.) The *Segoviano* court thus held that the defense of implied assumption of risk "plays no part in the comparative negligence system of California." (*Id.* at p. 164.) Various Court of Appeal decisions soon challenged this holding of *Segoviano*.

One decision characterized *Segoviano*'s analysis as "suspect." (*Rudnick* v. *Golden West Broadcasters* (1984) 156 Cal.App.3d 793, 800, fn. 4 [202 Cal.Rptr. 900].) Another case disregarded it entirely in reaching a contrary result (*Nelson* v. *Hall* (1985) 165 Cal.App.3d 709, 714 [211 Cal.Rptr. 668] ["Where assumption of the risk is not merely a form of contributory negligence," it remains "a complete defense."]; accord, *Neinstein* v. *Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176, 183 [229 Cal.Rptr. 612]; *Willenberg* v. *Superior Court* (1986) 185 Cal.App.3d 185, 186-187 [229 Cal.Rptr. 625]). And in *Ordway* v. *Superior Court* (1988) 198 Cal.App.3d 98, 104 [243 Cal.Rptr. 536] (hereafter *Ordway*), the court rejected *Segoviano* outright, holding instead that "reasonable" implied assumption of risk continued as a complete defense under the newly adopted system of comparative fault.

The Court of Appeal that decided *Ordway, supra*, interpreted *Li*'s reference to a form of assumption of risk under which " 'plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him [or her]' " (*Li, supra*, 13 Cal.3d at p. 824) as describing a doctrine that the

*Ordway* court termed "reasonable" implied assumption of risk. This doctrine, the *Ordway* court concluded, was unaffected by *Li*'s adoption of a system of comparative negligence and remained a complete defense after *Li*. (*Ordway, supra,* 198 Cal.App.3d 98, 103-104.) According to *Ordway,* a plaintiff who voluntarily and reasonably assumes a risk, "whether for recreational enjoyment, economic reward, or some similar purpose," is deemed thereby to have agreed to reduce the defendant's duty of care and "cannot prevail." (*Id.* at p. 104.)

After concluding that the defense of implied assumption of risk remained viable after this court's decision in *Li, supra,* 13 Cal.3d 804, the *Ordway* court discussed the preclusive impact of the defense on the facts of the case before it. *Ordway* involved a negligence action brought by a professional jockey who had been injured in a horse race when another jockey, violating a rule of the California Horse Racing Board, crossed into the plaintiff's lane. The court first noted that professional jockeys must be aware that injury-causing accidents are both possible and common in horse racing, as in other sports activities. (*Ordway, supra,* 198 Cal.App.3d 98, 111.) The court observed that although the degree of risk to be anticipated would vary with the particular sport involved, a plaintiff may not recover from a coparticipant for a sports injury if the coparticipant's injury-causing actions fell within the ordinary expectations of those engaged in the sport. (*Id.* at pp. 111-112.) On this basis, the *Ordway* court held that the plaintiff jockey's action was barred.

Other decisions by the Courts of Appeal that have addressed implied assumption of risk have followed *Ordway, supra,* 198 Cal.App.3d 98. (*Nunez* v. *R'Bibo* (1989) 211 Cal.App.3d 559, 562-563 [260 Cal.Rptr. 1]; *Von Beltz* v. *Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1477-1478 [255 Cal.Rptr. 755]; *King* v. *Magnolia Homeowners Assn.* (1988) 205 Cal.App.3d 1312, 1316 [253 Cal.Rptr. 140].) In my view, *Ordway* was correct in its conclusions that the defense of implied assumption of risk survived this court's adoption in *Li* (*supra,* 13 Cal.3d 804) of a system of comparative fault, and that the defense remains a complete bar to recovery in negligence cases in which the plaintiff has knowingly and voluntarily consented to encounter a specific risk.

*Ordway* was also correct in its observation that the terms "unreasonable" and "reasonable" are confusing when used to distinguish the form of implied assumption of risk that has merged into the system of comparative fault from the form that has not so merged. As *Ordway* suggested, the reasonable/ unreasonable labels would be more easily understood by substituting the terms "knowing and intelligent," for "reasonable," and "negligent or careless" for "unreasonable." (*Ordway, supra,* 198 Cal.App.3d 98, 105.)

The defense of implied assumption of risk is never based on the "reasonableness" of the plaintiff's conduct, as such, but rather on a recognition that

a person generally should be required to accept responsibility for the normal consequences of a freely chosen course of conduct. (See Simons, *Assumption of Risk and Consent in the Law of Torts: A Theory of Full Preference* (1987) 67 B.U. L.Rev. 213, 258 ["consent is neither reasonable nor unreasonable[;] [i]t simply expresses what plaintiff wants or prefers"].) In implied assumption of risk situations, the plaintiff's conduct often defies legal characterization as either reasonable or unreasonable. Even when this is not so, and a court or jury could appropriately determine whether the plaintiff's conduct was reasonable, the distinction to be drawn is not so much between reasonable and unreasonable conduct. Rather, the essential distinction is between conduct that is deliberate and conduct that is merely careless. Referring to "reasonable" implied assumption of risk lends unwarranted credence to the charge that the law is "whimsical" in treating unreasonable behavior more favorably than behavior that is reasonable. There is nothing arbitrary or whimsical in requiring plaintiffs to accept responsibility for the consequences of their considered and deliberate choices, while at the same time apportioning liability between a plaintiff and a defendant who have both exhibited carelessness.

In those cases that have merged into comparative fault, partial recovery is permitted, not because the plaintiff has acted unreasonably, but because the unreasonableness of the plaintiff's apparent choice provides compelling evidence that the plaintiff was merely careless and could not have truly appreciated and voluntarily consented to the risk, or because enforcement of the implied agreement on which the defense is based would be contrary to sound public policy. In these cases, implied assumption of risk is simply not available as a defense, although comparative negligence may be.

. In those cases in which a plaintiff's decision to encounter a specific known risk was not the result of carelessness (that is, when the plaintiff's conduct is not merely a form of contributory negligence), nothing in this court's adoption in *Li* (*supra*, 13 Cal.3d 804) of a system of comparative fault suggests that implied assumption of risk must or should be eliminated as a complete defense to an action for negligence. I would hold, therefore, that the defense continues to exist in such situations unaffected by this court's adoption in *Li* of a comparative fault system.

## III

Has implied assumption of risk been established as a complete defense in this case? When the facts material to assumption of risk are not in dispute, the defense can be decided by the trial court on a motion for summary judgment. (Code Civ. Proc., § 437c, subds. (a), (c), (f); *Garcia* v. *Rockwell*

*Internat. Corp.* (1986) 187 Cal.App.3d 1556, 1560 [232 Cal.Rptr. 490]; *Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].)

As explained in some detail earlier, implied assumption of risk provides a complete defense to liability for a defendant's negligence in cases involving a plaintiff's participation in sports activity in spite of, or specifically to encounter, the hazards posed by the activity. Proof of the defense lies in evidence that the plaintiff's participation in the activity was voluntary and that the plaintiff knew or must have known and appreciated the specific risk that resulted in the injury. Here, the trial court granted summary judgment for defendant Gouin, applying the bar of assumption of risk to negate his liability. Independent review of the facts offered in conjunction with the summary judgment motion (see *Hayman* v. *Block* (1986) 176 Cal.App.3d 629, 640 [222 Cal.Rptr. 293]) supports the trial court's ruling.

As mentioned earlier, for the defense to apply, the confrontation of the specific risk must be voluntary and under circumstances showing that the plaintiff must have known of the risk. These two factors are met in this case. The voluntariness of plaintiff Ford's decision to water ski barefoot and backward in the Warren Cut, a narrow, tree-lined channel, is not in question. He owned both the boat and the tow rope, and chose the location and the boat's speed. And, based on the undisputed facts presented in conjunction with defendant Gouin's motion for summary judgment, Ford must have been aware of the danger he faced in skiing barefoot and backward in that location.

Ford had skied the Warren Cut before and knew that trees along its banks hung over the waterway. He was aware that the sandbar reduced the navigable water space. He also knew that he lacked the ability to cross the wake and that he would be skiing at angles of as much as 35 degrees and perhaps even 45 degrees off the left side of the boat. Ford's own declaration stated that he was an avid water-skier with 15 years of experience and that he had skied barefoot and backward more than 50 times. Based on Ford's admitted familiarity with the narrow channel and his knowledge of this particular sport, he must have known he could collide with an overhanging branch if the boat that was towing him veered slightly off course as defendant Gouin, the driver of the boat, attempted to navigate it through the narrow channel at 40 miles per hour while simultaneously watching out for the skier behind him.

To decide whether plaintiff assumed the risk in this case, the lead and dissenting opinions dispute whether defendant's operation of the tow boat violated a duty imposed by Harbors and Navigation Code section 658,

subdivision (d) (hereafter section 658(d)).[4] In my view, the injury-causing conduct (plaintiff's as well as defendant's) ran afoul of this statute. That fact, however, is not dispositive on the issue of assumption of risk. Rather, under the traditional analysis governing the assumption of risk doctrine, the existence of section 658(d) merely raises the question whether it is the type of safety enactment that would preclude defendant Gouin from asserting assumption of risk as a defense barring plaintiff Ford from recovering damages in his negligence action. It is not.

Whether a particular statute comes within this exception to the assumption of risk bar depends on the public policy declared by that statute. (*Shahinian v. McCormick* (1963) 59 Cal.2d 554, 565 [30 Cal.Rptr. 521, 381 P.2d 377].) As mentioned previously, statutes within this exception commonly are those intended to protect classes of persons unable to protect themselves. (See *Finnegan v. Royal Realty Co.* (1950) 35 Cal.2d 409, 431 [218 P.2d 17]; *King v. Magnolia Homeowners Assn.* (1988) 205 Cal.App.3d 1312, 1316-1317 [253 Cal.Rptr. 140].) The Restatement Second of Torts explains the rule as follows: in cases involving tortious conduct by a defendant in violation of a statute, a plaintiff's assumption of risk will bar recovery unless imposing the bar "would defeat a policy of the statute to place the entire responsibility for [the] harm . . . on the defendant." (Rest.2d Torts, § 496F.)

The policy that underlies section 658(d) is one aimed at preventing towed water skis, aquaplanes, and similar devices, and their riders, from colliding with other persons or objects. That policy would not be defeated by placing responsibility for the harm on a plaintiff whose injuries resulted from the plaintiff's own choice of location and manner of water-skiing. Accordingly, section 658(d) does not preclude application of the assumption of risk defense in this case.

The defense of implied assumption of risk is most appropriately applied when the evidence shows an implied agreement that "the defendant will engage in certain conduct the plaintiff desires if the plaintiff will waive liability should the defendant prove to be negligent." (Rosenlund & Killion, *Once a Wicked Sister: The Continuing Role of Assumption of Risk Under Comparative Fault in California* (1986) 20 U.S.F. L.Rev. 225, 244.) Here defendant Gouin engaged in conduct that plaintiff Ford desired: At Ford's request, Gouin drove Ford's boat so that Ford could water-ski barefoot and

---

[4]Harbors and Navigation Code section 658, subdivision (d) prohibits the operation or manipulation of a "vessel, towrope or other device by which the direction or location of water skis, an aquaplane, or similar device may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon, to collide with, or strike against, any object or person." A violation of the provision is a misdemeanor. (Harb. & Nav. Code, § 668, subd. (c).)

backward through a narrow channel, between a sandbar on one side and overhanging tree branches on the other. Gouin's evidence established that Ford voluntarily chose to engage in this activity with knowledge and appreciation of its specific risk. Ford offered no evidence sufficient to raise a triable issue of fact on any element of the defense of assumption of risk.

For the reasons set forth above, I conclude that the evidence submitted in connection with the summary judgment motion established as a matter of law the complete defense of implied assumption of risk. On that basis I would affirm the judgment of the Court of Appeal.

Panelli, J., and Baxter, J., concurred.

**GEORGE, J.,** Concurring and Dissenting.—I concur fully in Justice Arabian's lead opinion insofar as it analyzes and resolves the validity of the trial court's summary judgment ruling under the "duty" approach to the doctrine of assumption of risk that has been endorsed by a majority of this court in *Knight* v. *Jewett* (1992, S019021), *ante*, page 296 [11 Cal.Rptr.2d 2, 834 P.2d 696].

In addition, for the reasons discussed in part II of the lead opinion, I also agree that, in the absence of an applicable statutory provision creating an expanded duty of care, the general rule limiting the duty of care of a coparticipant in an active sport to the avoidance of intentionally injurious or reckless misconduct applies to a ski boat driver towing a water-skier. Because in this case defendant was at most negligent, and clearly neither intended to injure plaintiff nor engaged in conduct so reckless as to fall totally outside the range of the ordinary activity involved in the sport of waterskiing, I would join in the lead opinion's conclusion that the summary judgment in favor of defendant should be affirmed, were I to agree with the lead opinion that Harbors and Navigation Code section 658, subdivision (d),[1] imposes no duty of care on a ski boat driver vis-à-vis the skier being towed by the driver.

## II

I part company with the lead opinion, however, on the narrow question of the proper interpretation of section 658, subdivision (d), which embodies the somewhat esoteric statutory law applicable to water-skiers and those persons who choose to tow them. Whereas the lead opinion concludes that section 658, subdivision (d), was intended to protect only third persons with whom

[1] Unless otherwise indicated, all further statutory references are to the Harbors and Navigation Code.

a water-skier might collide or whose property might be damaged by such a collision, I conclude, for the reasons discussed hereafter, that section 658, subdivision (d), was intended to protect not only third parties—but also the towed water-skier—from a collision caused by the operator of the boat that is towing the skier.

As the lead opinion indicates, section 658, subdivision (d), provides in full: "No person shall operate or manipulate any vessel, towrope, or other device by which the direction or location of water skis, an aquaplane, or a similar device may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon, to collide with, or strike against, any object or person. This subdivision does not apply to collisions of two or more persons on water skis, aquaplanes, or similar devices being towed by the same vessel."

The lead opinion suggests that the language of section 658, subdivision (d), "provides no clear answer" to the question whether the water-skier who is being towed is within the class of persons for whose protection the statute was adopted. (Lead opn., *ante*, p. 349.) Although acknowledging that the language of the subdivision's initial sentence ("[n]o person shall operate . . . any vessel . . . so as to cause the water skis . . . or any person thereon, to collide with . . . any object or person") is "sufficiently broad to include water-skiers themselves within the protected class" (lead opn., *ante*, p. 349), the opinion asserts that the second and concluding sentence of the subdivision ("[t]his subdivision does not apply to collisions of two or more persons on water skis . . . being towed by the same vessel") "suggests that the statute was not designed to create a duty of care on the part of the driver of the vessel to the persons being towed." (Lead opn., *ante*, p. 349.)

I disagree with the inference that the lead opinion draws from the concluding sentence of section 658, subdivision (d). In my view, rather than indicating that towed water-skiers are not generally within the class of persons the subdivision was intended to protect, the concluding sentence of section 658, subdivision (d), simply creates *a limited exception* for collisions between multiple skiers towed by a single boat, and does not deny a towed skier the protection of the statute with regard to a collision with an object, such as an overhanging tree, that is not being towed by the boat. Indeed, if, as the lead opinion suggests, the first sentence of the subdivision was not intended to protect towed water-skiers under any circumstances, there would have been no need to create the limited exception set forth in the concluding sentence of the subdivision. Thus, I believe that the language of section 658, subdivision (d), in itself, demonstrates that the provision was generally intended to protect towed water-skiers as well as third parties.

The lead opinion suggests, however, that its conclusion that section 658, subdivision (d) was intended to protect only third parties (and their property) and not towed water-skiers is "even more reasonable when subdivision (d) is considered in the context of other subdivisions of section 658." (Lead opn., *ante*, p. 349.) In my view, exactly the opposite is true. When the language of the other subdivisions of section 658 is taken into account, I believe it becomes even clearer that section 658, subdivision (d), was intended for the benefit of the towed water-skier as well as for the benefit of third parties.[2]

Section 658, subdivision (a) provides that "[n]o person shall operate a vessel . . . for towing a person or persons on water skis . . . unless there is in the vessel a person at least 12 years of age, in addition to the operator, in a position to observe the progress of the persons being towed." In my view, this subdivision plainly reveals that the Legislature was concerned with the protection of the towed water-skier as well as third parties.

The lead opinion maintains, however, that section 658, subdivision (a) "is plausibly interpreted as a measure to ensure that drivers do not inadvertently steer water-skiers into the path of third persons or objects" (lead opn., *ante*, p. 350), suggesting that this subdivision was intended to protect *only* such third persons or objects and *not* the towed water-skiers themselves. With all

---

[2]Section 658 provides in full:

"(a) No person shall operate a vessel on any waters for towing a person or persons on water skis, an aquaplane, or a similar device unless there is in the vessel a person at least 12 years of age, in addition to the operator, in a position to observe the progress of the persons being towed.

"This subdivision does not apply to motorboats less than 16 feet in length actually operated by the person or persons being towed and so constructed as to be incapable of carrying the operator in or on the motorboat. The department may establish rules and regulations governing the operation of those watercraft, which rules and regulations shall provide the greatest possible safety of persons and vessels.

"(b) No person shall operate a vessel on any waters of this state towing a person or persons on water skis, an aquaplane, or a similar device nor shall any person engage in waterskiing, aquaplaning, or other similar activity at any time between the hours of sunset to sunrise, except that those hours do not apply to those waters of this state as to which prohibited hours for those activities are fixed by local ordinances, laws, or regulations enacted pursuant to this chapter.

"(c) Subdivisions (a) and (b) of this section do not apply to a performer engaged in a professional exhibition or a person or persons engaged in a regatta, vessel or water ski race, or other marine event authorized pursuant to Section 268.

"(d) No person shall operate or manipulate any vessel, towrope, or other device by which the direction or location of water skis, an aquaplane, or a similar device may be affected or controlled so as to cause the water skis, aquaplane, or similar device, or any person thereon, to collide with, or strike against, any object or person. This subdivision does not apply to collisions of two or more persons on water skis, aquaplanes, or similar devices being towed by the same vessel.

"(e) No person shall operate water skis, an aquaplane, or a similar device so as to endanger the life, limb, or property of any person."

respect, I do not believe that interpretation is a plausible reading of section 658, subdivision (a). In my view, a statute prohibiting any person from operating a ski boat "unless there is in the vessel a person at least 12 years of age, in addition to the operator, to observe the progress of the person being towed," can reasonably be interpreted only as having been enacted at least as much for the protection of the towed water-skier as for the protection of third parties with whom a skier might collide. On its face, section 658, subdivision (a), applies even when there are no other persons in the vicinity who might be injured by the water-skier, and it is evident that in many circumstances the presence of an observer will be important only to safeguard the well-being of the towed water-skier and not third persons. To my mind, the lead opinion's suggestion that the Legislature, in adopting a mandatory observer-requirement, did not intend to protect water-skiers, but only third parties, belies common sense. (See also § 658.7, subd. (a)(1) [requiring operator of vessel involved in towing a skier to display a ski flag to indicate a downed skier].)

Furthermore, contrary to the lead opinion's assertion, the provisions of another subdivision of section 658—section 658, subdivision (e)—lend no support to the lead opinion's interpretation of section 658, subdivision (d). Section 658, subdivision (e), provides that "[n]o person shall operate water skis, an aquaplane, or a similar device so as to endanger the life, limb or property of any person." (Italics added.) Although the lead opinion declares that "[o]bviously, the class of persons protected by subdivision (e) is limited to third persons and their property, since the water-skier is in no position to harm anyone else" (lead opn., *ante*, p. 350), the language of subdivision (e) ("no person shall operate water skis . . . so as to endanger the life, limb or property *of any person*" [italics added]) certainly is not limited to the protection of third parties. Were a water-skier to operate his or her skis or aquaplane in a manner which endangered the life, limb, or property of the driver or the passengers in the ski boat—for example, by engaging in a reckless stunt which caused a ski or some other object to fly into the boat—a ski boat driver or passenger injured by such misconduct of the water-skier clearly would appear to fall within the class of persons protected by section 658, subdivision (e). In short, nothing in the language or purpose of section 658, subdivision (e), suggests that either that subdivision, or section 658, subdivision (d), was intended to protect only third persons or their property.

Thus, section 658, viewed as a whole, confirms the conclusion that the Legislature, in adopting the provisions of section 658, subdivision (d), acted for the benefit of both third persons and the towed water-skier in specifying that the operator of a ski boat is under an obligation to avoid operating the vessel in such a way as to cause the skier to collide with any object or person.

Finally, the legislative history of the statute provides yet additional support for this conclusion. Section 658, subdivision (d), was initially enacted as part of a comprehensive legislative scheme establishing statewide standards for recreational boating activities throughout California. (Stats. 1959, ch. 1454, §§ 1-4, pp. 3736-3749.) This 1959 legislation, which was based on a model "State Boat Act" proposed by the Council of State Governments, followed two legislative studies of the safety problems resulting from the increasing popularity of recreational boating in California, the rise in boating and waterskiing accidents, and the absence of uniform standards. In a summary contained in the initial study, a legislative committee observed that legislation in this area "should be aimed at protecting and promoting boating, safeguarding *those who participate,* as well as innocent bystanders." (Sen. Interim Com. Rep. on Bay Development and Small Boat Harbors, p. 22, 1 Appen. to Sen. J. (1957 Reg. Sess.), italics added.) And in the second study, which proposed the actual legislation that ultimately was enacted into law, the report explicitly stated that the act's safety regulations were intended to prevent an operator of a recreational boat from "endanger[ing] the life, limb or property *of any person including his own.*" (16 Assem. Interim Com. Rep. (1957-1959) No. 5 (Mar. 16, 1959) p. 18, 2 Appen. to Assem. J. (1959 Reg. Sess.), italics added.) This legislative history, and the breadth of the resulting legislation, is plainly inconsistent with the lead opinion's conclusion that section 658, subdivision (d), was intended to protect only third parties, and not the towed water-skier.

Accordingly, I conclude plaintiff is within the class of persons section 658, subdivision (d), was intended to protect. In light of this determination, were the trier of fact to find that defendant violated section 658, subdivision (d), it would follow, under Evidence Code section 669, that defendant violated his legal duty of care to plaintiff, unless the trier of fact also were to find defendant had proved that, in operating the vessel, he did "what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law . . . ." (Evid. Code, § 669, subd. (b)(1).) Because the declarations submitted in support of and in opposition to the summary judgment motion raise a triable issue of fact as to whether defendant's conduct breached a legislatively created duty of care owed to plaintiff under section 658, subdivision (d), and Evidence Code section 669, I conclude that summary judgment should not have been granted in favor of defendant under the doctrine of assumption of risk.

For the foregoing reasons, I would reverse the judgment of the Court of Appeal and permit the case to proceed to trial. Of course, plaintiff may not prevail at trial, and even if the trier of fact does find that defendant's conduct breached a legal duty to plaintiff and was a contributing cause of plaintiff's

injury, the trier of fact still would be free, under comparative fault principles, to allocate the greater share of the responsibility for the injury to plaintiff, in view of the role plaintiff's own conduct played in bringing about his injury. (See, e.g., *Metzger* v. *Barnes* (1977) 74 Cal.App.3d 6, 9-11 [141 Cal.Rptr. 257] [upholding jury verdict apportioning 90 percent of responsibility for waterskiing accident to plaintiff water-skier].)

Lucas, C. J., concurred.

**MOSK, J.**—I dissent. Like Justice George, I conclude that Harbors and Navigation Code section 658 (section 658) requires reversal of the judgment of the Court of Appeal. (See conc. & dis. opn. of George, J., *ante*, p. 368.) The lead opinion's interpretation of the application of Evidence Code section 669 to section 658, subdivision (d), is entirely unpersuasive.

The lead opinion looks to be somewhat tentative, for its conclusions end repeatedly in the wan acroteleutic that they "appear" or "seem" to be "reasonable." (Lead opn., *ante*, pp. 349-350.) The lead opinion's hesitancy is understandable, for its interpretation of section 658 flies in the face of the section's plain language and legislative history, as Justice George's concurring and dissenting opinion (*ante*, p. 364-368) clearly establishes.

Moreover, as I explained in my concurring and dissenting opinion in *Knight* v. *Jewett, ante,* page 321 [11 Cal.Rptr.2d 18, 834 P.2d 712], we should abolish the anachronistic doctrine of implied assumption of risk. It will inevitably come about—preferably sooner than later.

Appellant's petition for a rehearing was denied October 1, 1992. Lucas, C. J., Mosk, J., and George, J., were of the opinion that the petition should be granted.